UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————————————————————
|
MELISSA WHITE,                                    |        Case No. 1:08-cv-734
|
        Plaintiff,                                |        Chief Judge Paul L. Maloney
|
                v.                                |
|
NORTHERN MICHIGAN REGIONAL HOSPITAL,              |
|
        Defendant.                                |
———————————————————————————

## OPINION and ORDER

**Dismissing the Complaint Without Prejudice:**
Dismissing the Title VII Claim for Failure to Exhaust Administrative Remedies
Declining Supplemental Jurisdiction over the State-Law Claims

Surgical technician Melissa White brings this Title VII / Pregnancy Discrimination Act ("PDA") pregnancy-discrimination action against her former employer, Northern Michigan Regional Hospital ("the hospital"), with pendent claims for sex and pregnancy discrimination and retaliation under Michigan's Elliott-Larsen Civil Rights Act ("MELCRA"). It is uncontested that the court has original federal-question jurisdiction over the Title VII claim (28 U.S.C. § 1332) and discretionary supplemental jurisdiction over the state-law claims (28 U.S.C. § 1367). White began working for the hospital as an at-will employee in September 2007, subject to a probationary period during which she was not eligible for vacation or progressive discipline procedures. The parties agree that White informed the hospital that she was pregnant on October 1, 2007, and her employment ended on

December 19, 2007,[1] towards the end of her probationary period. The hospital moves to dismiss on the ground that White failed to exhaust her administrative remedies. In the alternative, the hospital moves for summary judgment on the ground, *inter alia*, that White cannot show a genuine issue of material fact as to some of the elements of a *prima facie* case of pregnancy discrimination.[2] The court heard oral argument on Wednesday, September 9, 2009. For the reasons that follow, the court will dismiss the Title VII claim without prejudice for failure to exhaust administrative remedies, and decline supplemental jurisdiction over the state-law claims.

**Background and Procedural History.**

White's Training and Performance. White is 25 years old and has earned two Associate's degrees from Mott Community College and a Surgical Technician Certification from Northern Michigan University; she and her husband and child lived in the Upper Peninsula ("UP") of Michigan during the relevant period, *see* Plaintiff's Brief in Opposition to Summary Judgment filed July 16, 2009 ("P's Opp") Ex 1 at 7 and Ex 2, though counsel stated at oral argument that they have since moved to Northern Lower Michigan.

White was hired on a probationary basis in the entry-level position of Surgical Technologist I ("Surgical Tech") for the hospital in Petoskey, Michigan. She was employed in that capacity from

---

[1]

At oral argument, the hospital's counsel did not give a clear, definitive answer as to whether the hospital believed that White had voluntarily quit rather than being terminated. For purposes of the instant opinion, any uncertainty or dispute on that issue is immaterial. The court intimates no opinion as to whether White quit or was terminated.

[2]

White contends that the hospital's stated rationale for firing her has changed over time, which can support an inference that the stated lawful reason for the adverse action is untrue. In light of today's disposition, the court need not address this issue.

Monday, September 17, 2007 until her termination about three months later, on Wednesday, December 19, 2007. *See* Ms. White's Complaint filed August 6, 2008 ("Comp") ¶¶ 6-7 and 17; *see also* P's Opp Ex 1 (White Dep) at 29. White's job was to assist physicians during surgery. *See* Defendant's Motion for Summary Judgment filed June 22, 2009 ("MSJ") Ex 2 (White Dep) at 25. She acknowledges that a surgical tech's schedule is based on the surgeries being performed at the hospital, which therefore needed sufficient staff available at the time each surgery is scheduled. *See* MSJ Ex 2 (White Dep) at 25.

The Surgical Tech position was White's first following her graduation. *See* MSJ Ex 3 (White's Employment Application). Like other new employees at the hospital, White was subject to a 180-day probationary period, during which she was ineligible for time off or progressive discipline procedures during that time. *See* MSJ Ex 2 (White Dep) at 49 and MSJ Ex 4 (excerpts from employee handbook). White understood that the training was important and that the hospital spent significant money and staff time to prepare new Surgical Techs for the transition to a regular surgical schedule. *See* MSJ Ex 2 (White Dep) at 94-95 and 123. She also understood that her supervisor, Jeanette Rockwell, was concerned about her inconsistent attendance because Rockwell was responsible for scheduling surgical techs in the operating rooms and the hospital needed White to be present and doing her job, *see* MSJ Ex 2 (White Dep) at 91.

The training required White to rotate through each of the operating-room surgical specialities, namely general/vascular, urology/gynecology, ENT/plastics, neurosurgery, and orthopedics. *See* MSJ Ex 2 or P's Opp Ex 1 (White Dep) at 29. During this training, White was observed and supervised by more-experienced surgical techs called preceptors, who provided feedback and evaluations. *See* MSJ Ex 2 (White Dep) at 44 and 95. Each week the preceptors

submitted progress reports, which Education Coordinator Jeanette Rockwell reviewed with White and the other probationary employees. *See* P's Opp Ex 1 (White Dep) at 29.

White presents progress reports which she characterizes as praising her performance and attitude throughout September, October and November, primarily September. The first progress report, hand-dated Sept. 20, 2007 by preceptor John Sackett, described White's first day of work as follows, in its entirety:

1.　　Summary of Assignments:  * * *

2.　　Time Management:  great for first day

3.　　Equipment/Supplies Management:  learning to read picksheet

4.　　Communication/Interpersonal Skills:  not afraid to ask questions

5.　　Additional Experiences Needed:  first day N/A

6.　　Strengths/Weaknesses:  interested in learning, time in surgery

P's opp Ex 4 at P0075.  The second progress report, hand-dated 9/21/07 by preceptor Diane Hinsley, states as follows, in its entirety:

1.　　Summary of Assignments:  * * *

2.　　Time Management:  working on management of movement and organization of supplies

3.　　Equipment/Supplies Management:  needs time to find where things are kept in this OR

4.　　Communication/Interpersonal Skills:  [blank]

5.　　Additional Experiences Needed:  Needs to keep moving – just takes time to understand this OR.

6.　　Strengths/Weaknesses: [blank]

P's Opp, Ex 4 at P0074.  The third progress report, hand-dated 9-23-07 by preceptor John Sackett,

states as follows, in its entirety:

      1.      Summary of Assignments:  * * *

      2.      Time Management:  good

      3.      Equipment/Supplies Management:  learning

      4.      Communication/Interpersonal Skills:  developing

      5.      Additional Experiences Needed:  yes

      6.      Strengths/Weaknesses:  Many

P's Opp, Ex 4 at P0072.  The fourth progress report, hand-dated 9-24-07 by preceptor Diane Koenigsknecht, states as follows, in its entirety:

      1.      Summary of Assignments:  * * *

      2.      Time Management:  OK

      3.      Equipment/Supplies Management:  OK

      4.      Communication/Interpersonal Skills:  good

      5.      Additional Experiences Needed:  more cases

      6.      Strengths/Weaknesses:   She remembers from case to case and asks appropriate questions. – Melissa needs to keep one eye & ear on the [sterile?] field and speed up counts

P's Opp, Ex 4 at P0073.  The fifth progress report, hand-dated 9-27-07 by preceptor Diane Koenigsknecht, states as follows, in its entirety:

      1.      Summary of Assignments:  * * *

      2.      Time Management:  She's working on it and will continue to get better

      3.      Equipment/Supplies Management:  same as above

      4.      Communication/Interpersonal Skills: friendly, asks approp. questions

5.	Additional Experiences Needed:  more case[s] especially bigger procedures

6.	Strengths/Weaknesses: positive attitude, desire to do well   [/] getting flustered or feeling overwhelmed setting up larger cases, needs to speed up on counting.

P's Opp, Ex 4 at P0071.  The sixth progress report, hand-dated 10-10-07 by a preceptor whose signature is illegible, states as follows, in its entirety:

1.	Summary of Assignments:  * * *

2.	Time Management:  Does good job with time mgt

3.	Equipment/Supplies Management:  Does good job with supply mgt.

4.	Communication/Interpersonal Skills:  Good communication skills

5.	Additional Experiences Needed:  More time with general vascular surgery

6.	Strengths/Weaknesses: Good job setting up 1st 2 cases.  Pretty good job converting 2nd case to an open case.  Need to put inst. into DR's hands.  Don't sit while waiting for DR & pt. to be in Room.  Please break scrub.

P's Opp, Ex 4 at P0066.  The seventh progress report, hand-dated 10-15-07 by preceptor Lori Rutherford, states as follows, in its entirety:

1.	Summary of Assignments:  * * *

2.	Time Management:  great job

3.	Equipment/Supplies Management:  great job

4.	Communication/Interpersonal Skills: doesn't like to be guided or given advice, a bit defiant but still good person

5.	Additional Experiences Needed: When gowning two or more doctors (and/or P.A. students) the second shouldn't get close to sterile field to be gowned (you know what incident I'm referring to)

6.	Strengths/Weaknesses:  Listen to us, we are only helping; not being mean!  You are doing wonderful, but there is still a lot to learn.

P's Opp, Ex 4 at P0065. The eighth progress report, hand-dated 10-17-07 by a preceptor whose name seems to be Mark Sanche and also referring to a preceptor named only "Lisa", states as follows, in its entirety:

1.      Summary of Assignments: * * *

2.      Time Management: ready on time.

3.      Equipment/Supplies Management: able to pick supplies necessary for case

4.      Communication/Interpersonal Skills: no problem communicating

5.      Additional Experiences Needed: more open vascular cases

6.      Strengths/Weaknesses: motivated eager to learn

P's Opp, Ex 4 at P0063. The ninth progress report, hand-dated 10-25-07 by a preceptor whose signature is illegible but may be named "Devonne McCarter", states as follows, in its entirety:

1.      Summary of Assignments: * * *

2.      Time Management: comes back from break promptly (sometimes sooner)

3.      Equipment/Supplies Management: [check mark symbol]'s case carts[,] asks appropriate questions regarding cases

4.      Communication/Interpersonal Skills: speaks up at appropriate times. Asks appropriate questions.

5.      Additional Experiences Needed: ["PLNL" or "PCNC" or ? -- illegible four-letter acronym]

        [illegible two letters]stectomy [illegible word] loop
        Brachy / Cryo

6.      Strengths/Weaknesses: Strengths are watching over pt., making sure pt. is in correct position, warn. – Sterile setup. – Is very observant. Quick learner.

P's Opp, Ex 4 at P0062. The tenth progress report, hand-dated 10-31-07 by White and 11-02-07 by a preceptor who may be named Devonne McCarter and also referring to a preceptor named only

"Terry", states as follows, in its entirety:

1.     Summary of Assignments:  * * *

2.     Time Management: Scrubbed and set up all cases in a timely manner. Counted @ appropriate times for all cases. Does not wait to be asked. Is an independent thinker!

3.     Equipment/Supplies Management: used tripolar and [two illegible words], suction irrigator, bipolar [illegible word], Tower.

4.     Communication/Interpersonal Skills: Kept Dr. Heidtke calm. The laparoscopy was a tough & difficult case. We opened everything and Melissa asked for appropriate equipment.

5.     Additional Experiences Needed: [blank]

6.     Strengths/Weaknesses: Does as she is asked or directed but sticks up for herself & pt !! Pt. was not properly cleaned off [symbol possibly meaning "after"] & Melissa made sure pt was taken care of.

P's Opp, Ex 4 at P0061.  The eleventh progress report, hand-dated 11-4-07 by preceptor Diane Koenigsknecht, states as follows, in its entirety:

1.     Summary of Assignments:  * * *

2.     Time Management:
3.     Equipment/Supplies Management:
4.     Communication/Interpersonal Skills:
[line drawn to indicate that the text corresponded to questions two, three and four together] Melissa had a good day. She was interested and receptive to info given in regards [sic] to the cases. Melissa took the initive [sic] to start on her ENT checklist.

5.     Additional Experiences Needed: See below

6.     Strengths/Weaknesses: more ENT cases

P's Opp, Ex 4 at P0057.  The twelfth progress report, hand-dated 11-11-07 by preceptor "D Koenigsknecht", states as follows, in its entirety:

1.     Summary of Assignments:  * * *

2.      Time Management:

3.      Equipment/Supplies Management:

Melissa needs to realize that she is being relied on to be a team member.  She knows what needs to be done but has to be told to do it.  ex. pulling extras, coming back to rm at end of day to clean room and she should not wait until scrub goes to room – she should go in & get things started.  The orientation period is her time to learn and the preceptor is there only to help her out and back her up.  At times she acts as if she doesn't want to be in the room and is slow at opening, setting up, & continuing on with the flow of scheduled surgery in room.[3]

4.      Communication/Interpersonal Skills:  Melissa needs to listen to what is being told to her because it is [illegible word] our experience that we are trying to prevent certain mistakes and it is frustrating that she does exactly what I just said not to – which then takes time to correct mistakes

5.      Additional Experiences Needed:  I'm honestly not sure what she needs in ENT because I can't tell what she is hearing.

6.      Strengths/Weaknesses:  I feel that Melissa started Mon. good but as the week progressed she lacked any initiative.  She needs to show interest and act like she wants to learn.

P's Opp, Ex 4 at P0056.  Someone other than preceptor Koenigsknecht hand-wrote at the bottom of the progress report, "I agree with Diane's assessment of Melissa's work."  The signature of that person, however, is partially cut off, perhaps in the process of counsel making a copy of the original record, and the comment bears no date.  The thirteenth progress report, hand-dated 11-29-07 by preceptor Teresa Brian, states as follows, in its entirety:

1.      Summary of Assignments:  * * *

2.      Time Management:    Melissa manages her time well.  She is able to set up cases, count and be ready for incision time.

3.      Equipment/Supplies Management:

---

[3]

    White's opposition brief attaches, but conveniently neglects to quote from this substantially negative progress report, nor does it quote any of the negative, mixed, or uncertain comments from other, more-positive progress reports.  Counsel is advised that such selective use of record evidence, and attempt to ignore adverse evidence, could be construed as misleading.

Does not waste supplies and has had the correct equipment/supplies
ready for scheduled cases.

4.      Communication/Interpersonal Skills:
Melissa's communication skills are appropriate. She asks questions that are pertinent
to neuro anatomy and case outcome.

5.      Additional Experiences Needed:
Craniotomies, Posterior Cervical, and Lumbar Fusion.

6.      Strengths/Areas for Improvement:
Only has been in neuro 2 days. Difficult to say at this time.

P's Opp, Ex 4 at P0054. <u>The fourteenth progress report</u>, again hand-dated 11-29-07 by preceptor
Teresa Brian, states as follows, in its entirety:

1.      Summary of Assignments: * * *

2.      Time Management: We haven't had any time to go over neuro positioning
devices, storage areas. Would like some time to go through her check list.

3.      Equipment/Supplies Management: [blank]

4.      Communication/Interpersonal Skills: I would suggest checking schedule for
following day so a better knowledge of cases could be achieved. Also,
reading preference cards (I still do even after the years I've been here).

5.      Additional Experiences Needed: Craniotomies, posterior cervical

6.      Strengths/Areas for Improvement: Melissa has been doing well in neuro.
Would suggest more note taking (or keeping a notebook on specific cases,
surgeon preferences etc. is helpful). Reminders to not let instruments remain
on pt. as they may roll off, b[e]come contaminated and we may not have
extras. Never a good idea to use patient as "table"

P's Opp, Ex 4 at P0053. The court need not definitively characterize White's preceptor evaluations

as "predominantly positive" or "predominantly negative"; it is unnecessary to resolution of the

instant motion, and such weighing of the evidence is the purview of the factfinder alone. But a

review of those evaluations cannot support White's unqualified assertion that "the supervisors began

criticizing the plaintiff's work performance while written documentation (preceptor reports in this

case) show satisfactory job performance." P's Opp at 20.[4]

Finally, preceptor surgical tech Diane Koenigskaecht apparently did not think highly of White's performance when, on an unspecified date, she allegedly remarked openly, "I wish they would hire people who could do their job, not just breath[e]." *See* MSJ Ex 2 (White Dep) at 29, 30 and 61-62. White construes Koenigskaecht's remark as unrelated to her pregnancy. *See* MSJ Ex 2 (White Dep) at 62.

The hospital's education coordinator, Jeanette Rockwell, oversaw the orientation program for new surgical techs. According to White, Rockwell's duties in this role included meeting with the surgical techs, bringing mistakes to their attention, inspecting surgical suites before surgery, visiting and observing during surgeries, and stopping techs in the hallway to discuss issues and point out errors. *See* MSJ Ex 2 (Smith Dep) at 29, 62-63 and 96 and MSJ Ex 5 (Deposition of Jeanette Rockwell dated April 7, 2009) at 5-6. White testified that she has no reason to believe that Rockwell did not point out errors to other new surgical techs. *See* MSJ Ex 2 (White Dep) at 63.

<u>Absences Unrelated to Pregnancy.</u> Again, White began work on September 17, 2007. It is undisputed that her pregnancy-related morning sickness did not begin until October 23, 2007, and that she called in sick on *four whole days* before that, for reasons *not related to her pregnancy*:

> Tuesday, October 2
> Wednesday, October 3
> Thursday, October 11
> Tuesday, October 23

*See* MSJ Ex 2 (White Dep) at 72-73.[5] After the morning sickness / nausea started, White missed

---

[4]

Someone might read White's preceptor evaluations and find that they are mostly positive. But it is difficult to characterize them as entirely "satisfactory."

[5]

White "does not dispute that she was absent from work or late on several [sic] occasions from October 2, 2007 until her employment ended. The records reflect that she was sick on October 2,

another day of work for reasons unrelated to her pregnancy: she cited inclement weather as the reason for not coming to work on Monday, December 3. *See* MSJ Ex 6. In total, White missed five days of work for reasons unrelated to her pregnancy in her first eleven weeks at the hospital: two days in Week 3, one day in Week 4, one day in Week 6, and one day in Week 11.

Finally, the hospital approved White to take two days off, apparently without pay, for her wedding: Friday, December 14 and Monday, December 17. *See* MSJ Ex 2 (White Dep) at 47-48 and 127; MSJ Ex 7 (Wed. October 3, 2007 e-mail from Kathy English to Jeanette Rockwell *et al.*) (noting White's request to take off October 28 for an unspecified purpose and December 14 & 17 for her wedding); and MSJ Ex 11 (White's calendar with handwritten notations).

Absences Related to Pregnancy. Finally, White left work early on three occasions due to her pregnancy-related conditions (Wed. October 24, Tue. November 13, and Tue. December 4). *See* MSJ Ex2 (White Dep) at 76. White acknowledges that she was scheduled to assist in surgeries on the days when she was incapacitated by pregnancy-related nausea and that her absence interfered with the scheduled surgeries. *See* MSJ Ex 2 (White Dep) at 74, 76-78. White also acknowledges that on two occasions in October, her pregnancy-related physical state impaired her ability to perform duties in the customary manner expected of the surgical techs. One day, White felt too hot to work in the surgical suite. Another day, she needed to sit down to work, which interfered with the "sterile field" required to minimize the risk of infection and complications for the patient.[6] The

3, 11, 23, 24, November 12, and November 13." P's Opp at 4 n.1 (citing White Dep at 72-73 & 91).

[6]
Physicians at the monthly magazine Infection Control Today explain that

**P**roper aseptic technique is one of the most fundamental and essential principles of infection control in the clinical and surgical setting. The word "aseptic" is defined as "without microorganisms," and aseptic technique refers to specific practices which reduce the risk of post-surgical infections in patients by decreasing the likelihood that

hospital had to reassign her from surgery to "checking carts" all day.  *See* MSJ Ex 2 (White Dep) at 54 & 82.

On one occasion in November, White was suffering pregnancy-related nausea; she alleges that while she was vomiting in a bathroom stall, supervisor Rockwell stood outside and admonished her, "You need to manage your pregnancy.  Why can't you come to work not being nauseous or physically sick when other people can.  You need to contact Dr. Wilder and find out what you can about your nausea."  White Dep (MSJ Ex 2) at 76; *see also* White Dep (MSJ Ex 2) at 35-36 (while White was in the bathroom, Rockwell allegedly remarked, "I don't understand why you can't manage your pregnancy like others.").  Rockwell denies making these comments, *see* P's Opp Ex 5 (Rockwell Dep) at 13-15, but for purposes of the hospital's summary-judgment motion, the court

---

infectious agents will invade the body during clinical procedures. * * *

* * *

Creating and maintaining a sterile field is an essential component of aseptic technique.  * * *

When a HCW has donned proper sterile surgical attire, the HCW's sterile area is the only area that should come in contact with the sterile field.  Only sterile objects and personnel may be allowed within the sterile field.  *When a sterile field is created around a procedure site, items below the level of the draped client are outside the field and are not sterile.  Experts say that a properly gowned and gloved HCW's sterile area extends from the chest to the level of the sterile field;* sleeves are sterile from 5cm above the elbow to the cuff.

1.  It is critical for HCWs to remember that only sterile items are free of potential infectious agents, and that *once a sterile object comes in contact with a non-sterile object, surface, or person*, or with dust or other airborne particles, *the object is no longer sterile. To maintain the sterile field, only sterile items should be placed within the sterile field.*

"Aseptic Technique and the Sterile Field:  Practice for Perioperative Nurses", unnumbered ¶¶ 1 and 6-7, posted April 1, 2005 at http://www.infectioncontroltoday.com/articles/541feat1.html (Virgo Publishing), retrieved Aug. 6, 2009 (emphasis added).

is obligated to accept White's version of events as true.

In the last week of September, White learned that she was pregnant, and she notified the hospital on Monday, October 1. *See* Comp ¶ 9; MSJ Ex 2 (White Dep) at 57; P's Opp (White Dep) at 18. On hearing the news, department manager Kathleen English said to White, "This is just what we need." *See* P'S Opp Ex 1 (White Dep) at 57 & 59. White further alleges that after she told the hospital about her pregnancy, they subjected her to greater scrutiny and her supervisors increasingly criticized her performance. *See* Comp ¶¶10-11. For example, White believed that Rockwell was constantly checking on her, watching her through the windows of operating rooms. *See* MSJ Ex 2 (White Dep) at 94. Unspecified supervisors allegedly made comments regarding White's pregnancy "throughout the work day" such as "you need to manage your pregnancy better." *See* Comp ¶ 11. In response to White's allegation of discriminatory increased scrutiny, the hospital introduces the following excerpts from her deposition testimony:

- when White talked about her wedding, supervisor Rockwell told her "pretty much no one cares", *see* MSJ Ex 2 (White Dep) at 90;[7]

- when White missed work due to morning sickness, supervisor Rockwell asked what she was doing about her nausea and told White that she needed to "get a good handle on it" and "you need to get a good handle on your pregnancy, you need to get it under control", *see* MSJ Ex 2 (White Dep) at 90;

- when White was sick at work, Rockwell told her, "If you're sick, you need to go home", *see* White Dep (MSJ Ex 2) at 36;

- Rockwell was frustrated with White's absences, and on an occasion when White was "overheating", Rockwell said to her, "I've got to figure out what to do with you", *see* White Dep (MSJ Ex 2) at 24;

- on at least one occasion, Rockwell told White that she needed to manage her pregnancy better because she was missing too much time from work, *see* White Dep

---

[7]It is unclear what significance the hospital believes a factfinder could attach to this alleged exchange regarding White's wedding.

(MSJ Ex 2) at 136.

White complains that Rockwell was "critical of [her] when she raised concerns about working with radiation during her first trimester." P's Opp at 4. It is undisputed that on Monday, November 26, a medical physicist employed by the hospital sent White an e-mail, with copies to English and Rockwell, stating in its entirety as follows:

> Hi Melissa,
>
> Please be advised that while pregnant you are allowed to work in a surgical room that is actively using Flouro during the procedure. Please ensure that you're wearing a Fetal badge during the procedure. This badge should be worn at the level of your pelvis underneath the leaded apron.
>
> Also, remember to practice safe ALARA practices when working in Flouro environments. If you have questions or concerns[,] Melissa[,] please call or page me.
>
> Thx . . . Dan . . . pager [number.]

P's Opp, Ex 6 (e-mail from Daniel Dryden, MS, DABR, at 10:53 a.m. on Mon. Nov. 26, 2007) (ellipses in original). Supervisor Rockwell showed White the e-mail and said, "you can't use this [pregnancy] as an excuse anymore." P's Opp, Ex 1 (White Dep) at 84.

The December 11th Meeting. White requested and obtained a meeting with the hospital's Director of Preoperative Services, Kathy English, held on December 11, 2007.[8] See MSJ Ex 2 (White Dep) at 34 and 116-17; MSJ Ex 6, Notes of English; MSJ Ex 9, Deposition of Kathleen English dated April 7, 2009 ("English Dep") at 30-32. At the meeting, White told English that supervisor Jeanette Rockwell's comments regarding her pregnancy[9] made her feel "insecure" about

---

[8]

White's complaint alleges that this meeting took place on December *12*, but her recollection of the exact date was "questionable" and she did not dispute English's notes, which reflected that the meeting took place on December 11. See MSJ Ex 2 (White Dep) at 116:12 through 24.

[9]

The hospital seeks to place significance on White's admission that despite knowing the hospital's official written policy against discrimination, she never reported Rockwell's alleged

keeping her job, and English responded by calling Rockwell into the meeting. *See* Comp ¶ 12.

Noting that White had had "attendance issues", i.e., either a full day or partial day's absence, on 11.76% of her work-days in less than three months at the hospital, English "said what's going on here, why are you missing so many days[?]" *See* MSJ Ex 2 (White Dep) at 132 and MSJ Ex 6 (English notes). White responded, "I have morning sickness, I am severely sick and I cannot control it." MSJ Ex 2 (White Dep) at 132. With regard to returning to work after an absence, White acknowledged that she had trouble remembering things and, when she was off for a day she "ha[d] to start all over." *See* MSJ Ex 6 (English notes) at 121-22.[10]

After discussing White's attendance, English and Rockwell talked to her about what they considered to be her lack of focus, lack of initiative and motivation, and other performance and attitude issues. English and Rockwell alleged that during her time at the hospital, White had responded negatively to constructive criticism, e.g., by rolling her eyes. *See* MSJ Ex 6 (English notes) at 121. They alerted White to a "Colleague Concern Form" dated October 19, 2007 which

---

discriminatory comments to anyone with authority to take action. *See* MSJ at 7, citing MSJ Ex 2 (White Dep) at 89-90. The court determines that this fact, if true, has no effect on the strength of the hospital's summary-judgment motion. If the factfinder found that White never reported Rockwell's alleged discriminatory comments, it could legitimately infer that the reason she never reported the comments is because Rockwell did not make them. But the factfinder would not be *compelled* to draw that inference in the hospital's favor. On summary judgment, the court is not permitted to weigh one piece of evidence against another or assess credibility.

[10]

White later testified that although the Employee Handbook contained no exception to the attendance policy for pregnant probationary employees, at least some of her absences should not "count" because she was pregnant. *See* MSJ Ex 2 (White Dep) at 53 and 118:14 to 120:9. When asked, "So essentially, your whole position is . . . your attendance shouldn't count against you because you were pregnant?", White answered "yes." *Id.* at 120:3 through 6. When asked whether that was "the basis for this lawsuit", White answered, "Well, not just that but the comments that were being made, yes." *Id.* at 120:7 through 9.

White acknowledges that if she had missed work for any other reason (i.e., a reason not related to pregnancy sickness), the absence or lateness still would have violated hospital rules in her situation as a probationary new hire. *See* MSJ Ex 2 (White Dep) at 131.

-16-

reported that after a surgical tech preceptor taught or advised White how to avoid repeating an error, she simply "does the same thing again" and that she did not go on break when permitted to do so but merely told preceptors and staff when she *would* take a break.  *See* MSJ Ex 6 (English notes) at 121. English and Rockwell also told White that while she started out focused and eager to learn, after only a few weeks she exhibited a pronounced lack of focus, initiative and motivation and was argumentative during feedback sessions with preceptors.  *See* MSJ Ex 6 (English notes) at 121-22.

White's complaint alleges that at the December 11 meeting, English and Rockwell failed to address her concerns regarding discriminatory treatment and remarks.[11]  *See* Comp ¶ 12.  In deposition, White recalled English explaining, at the December 11 meeting, that she was expected to be a full-time employee but now she was constantly using morning sickness as an excuse to miss work.  *See* MSJ Ex 2 (White Dep) at 123-24.  At the end of the meeting, department manager English asked supervisor Rockwell to provide White with computer access codes so that she could work on "study modules" at home.  *See* MSJ Ex 2 (White Dep) at 126-27.  (White was required to complete these modules by December 31, 2007 as part of her training.  *See* P's Opp at 5, citing Ex 1 (White Dep) at 124.)

Before the December 11 meeting, White, like other probationary hospital employees, had been required to meet with her supervisor once per week.  After the meeting, pursuant to a Performance Improvement Plan, White was required to meet with the supervisor every day for two weeks and undergo another review on December 21 (at the conclusion of her three-month

---

[11]

*Cf. Hamilton v. General Electric Co.*, 556 F.3d 428, 440 (6th Cir. 2009) (a Title VII plaintiff "'cannot create a submissible case of unlawful retaliation by interjecting her announcement of a discrimination claim in the middle of a previously scheduled meeting to discuss her absences from work'") (quoting *Hervey v. County of Koochiching*, 527 F.2d 711, 723 (8th Cir. 2008)), *reh'g & reh'g en banc denied* (6th Cir. May 29, 2009).

probatory period).  *See* Comp ¶ 12; MSJ Ex 2 (White Dep) at 124.

White acknowledges that when she left the December 11 meeting, she knew that her supervisors considered her to have performance and attendance issues, and she was on notice that her performance was not to hospital standards and she might be fired because of it.  *See* MSJ Ex 2 (White Dep) at 130-31.  The hospital points to this deposition testimony as White's acknowledgement that her missing work was the reason for her supervisors' consternation, not her pregnancy *per se*:  "I left that meeting [on December 11] thinking if I wasn't pregnant I wouldn't have gotten sick, and if I wouldn't have gotten sick, I wouldn't have missed work and if I wouldn't have missed work I wouldn't be having this meeting."  MSJ EX 2 (White Dep) at 131.  White also recognized that absences violated the hospital's rules for probationary employees whether they were caused by pregnancy-related sickness or not.  *See* MSJ EX 2 (White Dep) at 131.

The December 19 Lateness, Meeting, and Termination.

With the hospital's approval, White took off two days for her wedding:  Friday, December 14 and Monday, December 17.  White apparently worked a full day on Tuesday, December 18, but she reported 45 minutes late for work on Wednesday, December 19, citing pregnancy-related morning sickness.  Supervisor Rockwell called her into a meeting to discuss her attendance and job performance.  *See* Comp ¶ 13; MSJ Ex 2 (White Dep) at 127 and 138-40; MSJ Ex 7 (English's e-mail to Rockwell regarding White's request for time off for wedding).

English or Rockwell asked White about the status of her work on the required study modules.  At the end of the meeting on December 11, department manager English had asked supervisor Rockwell to provide White with computer access codes so that she could work on the modules at home, *see* MSJ Ex 2 (White Dep) at 126, but White revealed that she had made no attempt to obtain the codes from Rockwell for a full week.  White agrees they did not ask Rockwell for the codes until

December 18, the night before this second meeting, but she blames *Rockwell*, stating, "Notably, Rockwell *failed* to give Melissa the information so that she could access the modules at home." P's Opp at 5, citing Ex 1 (White Dep) at 126-27.

Next, the supervisors said they had heard that White "was unhappy with" or "hated" her job, felt that everyone was "mean" to her, and planned not to return to the hospital after her maternity leave. *See* Comp ¶ 14; MSJ Ex 2 (White Dep) at 142; MSJ Ex 12 (Dec. 11, 2007 Colleague Concern Form signed by Jeannette Rockwell, R.N.). White does not contest the hospital's statement, *see* MSJ at 8, that she "did not deny" the report that she "hated" working at the hospital.

The supervisors asked how much maternity leave White expected to take, and advised that she would be entitled to only six weeks maternity leave. According to White's complaint, she responded that "she would take whatever time was necessary to care for her child after the birth." *See* Comp ¶¶ 14-15. But White testified more specifically at deposition that she responded that she was looking to take 8 to 12 weeks of leave. *See* MSJ Ex 2 (White Dep) at 140-41. After White's response, department manager English called the Personnel Department and had them inform White that, assuming a normal delivery, she would be entitled to only six weeks maternity leave. *See* Comp ¶ 15 and MSJ Ex 2 (White Dep) at 144.

According to the complaint, Rockwell stated that *she* had never missed time from work due to *her* pregnancy, and she fired White at the conclusion of the meeting, effective immediately. *See* Comp ¶¶ 16-17. In deposition, however, White gave a different and seemingly shifting account of whether she quit or was fired. White initially testified that English told her "I think it's best if we just let you go." But White also recalled that *she* (White) had stood up and put her hand on the door, leading English to ask, "['] where are you going [?'] and I said I'm leaving and she goes [']well can I have your badge.[']" MSJ Ex 2 (White Dep) at 143. This later allegation by White is consistent

-19-

with English's recollection.  When asked about the end of the December 19 meeting, English testified that

> at some point in that discussion, she got up and approached the door to the office, which was closed.  And I asked her where she was going, and she said she was leaving.  And I asked her to clarify that, and I don't remember exactly what she said, but it led me to believe that she was quitting, that she was leaving our employ, we need your ID badge and the x-ray badges, as well as parking permits.

MSJ Ex 9 (English Dep) at 50.  White emphasizes that she never actually *said*, in so many words, that she was quitting or resigning.  *See* P's Opp at 6-7, citing Ex 3 (English Dep) at 50.

After the termination, her supervisors told White's friend and co-worker that she had been fired, and they asked other co-workers about White's work performance.  *See* Comp ¶ 18.


### PROCEDURAL HISTORY

White asserts only one claim arising under federal law.  Her first count claims that the Hospital fired her at least in part because she was pregnant, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 200e(k).  *See* Comp ¶¶ 21-25.  The remaining counts assert pendent claims under MELCRA, MICH. COMP. LAWS § 37.2101 *et seq., see* Comp ¶¶ 26-32 (count two, sex and pregnancy discrimination) & Comp ¶¶ 33-36 (count three, retaliation).  White demanded a jury trial and seeks reinstatement, back pay and benefits, front pay and benefits, other compensatory and punitive damages, an injunction prohibiting further discrimination and retaliation, and an award of interest and attorneys' fees and costs.  *See* Comp at 7, Prayer for Relief.

The hospital moved for summary judgment in June 2009, White filed an opposition brief on July 16, and the hospital filed a reply brief on July 30, 2009.  In late August 2009, as directed by the court, the hospital filed a supplemental reply brief further developing and supporting its contention

that the complaint should be dismissed for failure to exhaust administrative remedies. White did not

file a response to the supplemental reply or seek an extension of time in which to do so.


### DISCUSSION:  Title VII Claim

As the United States Supreme Court has declared,

> In Title VII Congress set up an elaborate administrative procedure, implemented
> through the EEOC, that is designed to assist in the investigation of claims of . . .
> discrimination in the workplace and to work towards the resolution of these claims
> through conciliation rather than litigation.

*Patterson v. McLean Credit Union*, 491 U.S. 164, 180-81 (1989) (citing 42 U.S.C. § 2000e-5(b)).

Likewise, our Circuit emphasizes that "the purpose of Title VII's administrative scheme is 'to

encourage reconciliation and arbitration of employee grievances prior to litigation.'"  *Steiner v.

Henderson*, 354 F.3d 432, 437 (6th Cir. 2003) (quoting *Morgan v. Washington Mfg. Co.*, 660 F.2d

710, 711 (6th Cir. 1981)).  *See also Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 471 (6th Cir.

2008) (D.J. Oliver, joined by Martin, J.) ("The policy or purpose of the exhaustion requirement 'is

to trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and

enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation.'") (quoting

*Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004) (citation omitted)); *EEOC v. Watkins v. Motor

Lines, Inc.*, 463 F.3d 436, 439 (6th Cir. 2006) (referring to "the EEOc's conciliation efforts (required

in ADA actions"), *reh'g & reh'g en banc denied* (6th Cir. Feb. 27, 2007); *Dixon v. Ashcroft*, 392

F.3d 212, 217 (6th Cir. 2004) (Moore, Cole, <u>D.J. Marbley</u>) ("The purpose of this requirement is to

trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and

enables the EEOC to initiate *conciliation procedures in an attempt to avoid litigation*.") (emphasis

added) (citing *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir. 1998)); *Young v. DaimlerChrysler

Corp.*, 52 F. App'x 637, 639 (6th Cir. 2002) (<u>Siler</u>, Daughtrey, D.J. Ann Aldrich).

It is undisputed that White filed her Charge of Discrimination with the Michigan Department of Civil Rights ("MDCR") on February 15, 2008, attesting under oath, "I also want this charge filed with the EEOC." *See* Hospital's Supp. Reply, Ex. 1 at Bates page P0380. It is also undisputed that sometime before April 17, 2008, White and her counsel contacted the MDCR and requested withdrawal of the charge "because I will pursue the issues raised in my complaint in court," because on that date MDCR Rights Representative Janet Dillard sent White a notice acknowledging that White had done so, and quoting White's exact language to that effect. *See* Hospital's Supp. Reply, Ex. 1 at Bates page 0381.

White alleged that she withdrew only her MDCR charge, without withdrawing her EEOC charge or terminating her participation in the EEOC process. *See* Plaintiff's Brief in Opposition to Defendant's Motion ("P's Opp") at 8 n.5. The court rejects this interpretation of White's action as untenable. Along with the notice acknowledging White's request to withdraw her charge and proceed in court instead, the MDCR attached a form, entitled Information for the Charging Party - How to Obtain an EEOC Notice of Right to Sue, which clearly advised her, in pertinent part:

> *This means your charge of discrimination filed with the Michigan Department of Civil Rights (MDCR) and dually filed with the Equal Employment Opportunity Commission (EEOC) will be closed*, because your intent is to sue the respondent company in federal court.
>
> Notices of Right to Sue are issued by the EEOC.
>
> To receive your RTS:
>
>> Sign a withdrawal form supplied by the MDCR. Your signature on the withdrawal form acknowledges your intent to close your case with the MDCR and to receive a Notice of Right to Sue from the EEOC.
>>
>> *MDCR will submit your withdrawal to the EEOC,* along with your request for a[n] RTS.
>>
>> *Your case will be closed with the EEOC when your RTS is issued.*

This process usually takes two months or longer.

Hospital's Supp. Reply, Ex. 1 at Bates page P0382 (emphasis added).

At oral argument, White's counsel emphasized that White had no authority or power to prevent the EEOC from continuing to investigate and, if it chose, to take action against the hospital in the enforcement of Title VII. The court agrees, of course, that a private party lacks statutory or regulatory authority to dictate whether the EEOC initiates or continues an investigation. *See Walker v. UPS, Inc.*, 240 F.3d 1268, 1273 (10th Cir. 2001) ("Private parties such as Walker do not have the power to take away EEOC's enforcement authority . . . .") (citing *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 456 (6th Cir. 1999) ("Significantly, an individual may not, in an effort to effectuate her own interests, take away the enforcement authority of the EEOC even if she wishes to withdraw her charge of discrimination."))[12]

---

[12]

Even this may be too charitable towards White's position on how much the EEOC could do once she withdrew her charge. While the EEOC might investigate to some degree without White's participation and cooperation, conciliation is another matter. In turn, the EEOC might not be permitted to file an action to enforce Title VII against the hospital if the hospital was not afforded an opportunity to *conciliate* with White under the EEOC's auspices. Our Circuit has quoted with approval the EEOC Commissioner's statement that "'*the Commission ordinarily may not sue or intervene in suits or issues on which it has not* found cause and *attempted conciliation*.'" *Jackson v. Richards Med. Co.*, 961 F.2d 575, 584 (6th Cir. 1992) (C.J. Merritt, Guy, Wellford) (quoting 45 Fed. Reg. 48614, 48615 (July 21, 1980) (no WestLaw citation available)).

*Accord EEOC v. Sherwood Med. Indus., Inc.*, 452 F. Supp. 678, 681 (M.D. Fla. 1978) (George Young, C.J.), where the court dismissed the EEOC's action to enforce Title VII's prohibitions on race and sex discrimination, stating,

If the Commission is to seek relief in federal court it must be prepared to show that it has satisfied the jurisdictional prerequisites including submitting the matters in issue to conciliation. It has not done so here and it therefore follows that suit on the sex discrimination claim was premature.

*Sherwood*, 452 F. Supp.2d at 681. *See also*, citing *Sherwood*:

**1st Circuit,** *EEOC v. IBEW*, 476 F. Supp. 341, 344-45 (D. Mass. 1979) ("Among the

-23-

But White's argument in this regard conveniently overlooks the fact that investigation is not

---

jurisdictional requirements of an EEOC-initiated enforcement action are . . . (2) inclusion of the defendant and the possibly discriminatory acts for which it is responsible in the reasonable[-]cause determination . . . and (3) efforts at informal settlement and conciliation prior to formal court action . . . . Of these three requirements, the most important is the attempt to conciliate . . . .") (citing 42 U.S.C. § 2000e-5(f)(1) and *EEOC v. Allegheny Airlines*, 436 F. Supp. 1300, 1306 (W.D. Pa. 1977));

**5th Circuit**, *EEOC v. HBH, Inc.*, 1999 WL 508403, *2 (E.D. La. July 19, 1999) ("Conciliation is . . . a condition precedent to the Commission's power to sue. There is no exception under the statute.  * * * [F]ailure to conciliate is fatal to an action brought by the EEOC.") (citing *EEOC v. Magnolia Elec. Power Ass'n*, 635 F.2d 375, 378 (5th Cir. 1981));

**7th Circuit**, *EEOC v. Warshawsky & Co.*, 1993 WL 303097, *14 (N.D. Ill. Apr. 15, 1993) (Gottschall, M.J.) ("[C]onditions precedent to suit will not have been met unless EEOC has exhausted the possibilities of conciliation with respect to each issue it seeks to litigate.") (citing *EEOC v. Motorola, Inc.*, 468 F. Supp.2d 857, 859 (N.D. Ill. 1987)), *R&R adopted in pertinent part*, 1994 WL 384041, *1 (N.D. Ill. July 21, 1994) (Hart, J.);

**8th Circuit**, *EEOC v. Am. Home Prods. Corp.*, 165 F. Supp.2d 886, 908-14 (N.D. Iowa Sept. 13, 2001), *recon. denied*, 2001 WL 34008710 (N.D. Iowa Dec. 20, 2001);

**9th Circuit,** *EEOC v. Bruno's Restaurant, Inc.*, 1990 WL 300242 (S.D. Cal. Aug. 16, 1990) (text of oral opinion, no WestLaw pagination available) ("the Commission must make a genuine effort to conciliate with respect to each and every employment practice complained of.  * * * Accordingly, conciliation is a prerequisite to this action, and there's been insufficient proof established in Plaintiff's case that the requirement of conciliation on a pattern and practice policy was satisfied.  * * *  So, the [employer's] motion [to dismiss title VII pregnancy-discrimination claims] must be granted on that basis.");

**10th Circuit**, *EEOC v. Gardner Mgmt. Group, LLC*, 2007 WL 1672820, *1 (W.D. Okla. June 5, 2007) (Robin Cauthron, J.);

**11th Circuit,** *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp.2d 1237, 1246 (M.D. Ala. 2001) ("[T]he court finds that any ADA claim is barred.  * * *  EEOC never attempted to conciliate this matter. * * * Accordingly, the court finds that it has no jurisdiction over any ADA claims.") (citing *Stehle v. General Mills Restaurant, Inc.*, 875 F. Supp. 320, 323 (D.S.C. 1994));

*EEOC v. Crown Liquors of Broward, Inc.*, 503 F. Supp. 330, 333 (S.D. Fla. 1980) ("The Commission's right to maintain suit is not without limitation, regardless of the scope of its investigation.  Thus, the Commission may not sue on a complaint broader in scope than the results of its investigation as contained in its reasonable-cause determination.  The determination of reasonable cause defines the framework for conciliation, and conciliation of all claims sought to be litigated must be attempted prior to suit thereon.") (internal citation omitted) (citing *EEOC v. Pierce & Stevens*, 434 F. Supp. 1162 (W.D.N.Y. 1977)).

the only major purpose of the administrative process. Nor is enforcement litigation (by the aggrieved employee or the EEOC) the only outcome contemplated by Congress. On the contrary, litigation from either source is decidedly *not* the outcome preferred by Congress, as our precedents make clear.

Rather, as our Circuit has emphasized, "'Voluntary compliance is Title VII's preferred method for promoting the goal of nondiscrimination; it is also the reason for the EEOC's existence.'" *Steiner*, 354 F.3d at 437 (quoting *St. John v. Employment Dev. Dep't*, 642 F.2d 273, 275 (9th Cir. 1981) and citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974) ("stating that '[c]ooperation and voluntary compliance" were selected by Congress as the preferred means of assuring equality of employment opportunities by eliminating discrimination, and '[t]o this end, Congress created the [EEOC]' and established a procedure by which the EEOC and cooperating local agencies would have an opportunity to settle disputes through conference and conciliation before the aggrieved party was allowed to file a lawsuit."); *see also Randolph v. Dep't of Youth Servs.*, 453 F.3d 724, 724, 731-32 (6th Cir. 2006) ("This requirement exists so that the EEOC will have an opportunity to convince the parties to enter into [a] *voluntary settlement, which is the preferred means of disposing of such claims*.") (citing *Parsons v. Yellow Freight Sys., Inc.*, 741 F.2d 871, 873 (6th Cir. 1984)) (emphasis added).

By unequivocally terminating her involvement in the EEOC administrative process, White thwarted "the EEOC's function as an efficient conciliator", which is "central to Title VII's statutory scheme." *Gavette v. Brady*, No. 92-2134, 7 F.3d 233, 1993 WL 384902, *2 (6th Cir. Sept. 28, 1993) (p.c.) (Guy, Nelson, Wellford); *cf. Jackman v. NLRB*, 784 F.2d 759, 764 (6th Cir. 1986) ((referring to "the generally accepted doctrine of promoting settlement agreements, which has been characterized as the 'lifeblood of the administrative process,' and is of the utmost importance to the

administration of the Act." ) (citation omitted). By definition, "conference" and "conciliation" are impossible when one of the parties indicates that she will no longer participate. *Cf., e.g., Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1311 (10th Cir. 2005) ("[W]e hold that a private sector employee must cooperate with the EEOC in order for the employee to exhaust his or her administrative remedies . . . ."); *Adair v. Broadlawns Med. Ctr.*, 102 F. Supp.2d 1092, 1097 (S.D. Iowa 1999) (because employee failed to cooperate with state civil-rights commission's efforts after filing discrimination charge, she did not exhaust her administrative remedies on Title VII claim). The administrative remedies which White short-circuited are part of a carefully designed, integrated framework which combines investigation, conference and conciliation, and lastly –  only if it is unavoidable, *after* the other processes have been fully tried – litigation. Aggrieved persons cannot pick and choose which components of the system they will allow to operate. *Cf. Hines v. Widnall*, 334 F.3d 1253, 1259 (11th Cir. 2003) (p.c.) (C.J. Edmondson, Kravitch, 8th Cir. J. John Gibson) ("[T]he EEOC had not yet reached a final determination on the merits of Appellants' claim. After the EEOC certified the administrative class, Appellants, by immediately filing suit in district court, failed to allow the administrative process to run its course. * * * *Appellants simply seek to pick and choose* from portions of a preliminary administrative order *without allowing the administrative process to complete itself*.") (emphasis added).

In short, Congress imposed a clear condition on the right to bring employment discrimination disputes to federal court, and White simply chose not to comply with that condition. White has not identified any authority which would allow this court to excuse such willful noncompliance. As the Supreme Court cautioned,

> Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular

litigants.  As we stated in *Mohasco Co. v. Silver*, 447 U.S. 807, 826 . . . (1980), "[i]n the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law."

*Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984) (p.c. for Rehnquist and 5 other JJ.).

*See, e.g., Dillard v. Inalfa Roof Sys., Inc.*, 2006 WL 2375701, *8 (E.D. Mich. Aug. 16, 2006) (Cleland, J.) ("Dillard essentially withdrew his EEOC claim by initiating the instant action prior to the EEOC's disposition of his claim.") (citing *Branham v. Home Depot USA, Inc.*, 225 F. Supp.2d 762, 766 (E.D. Mich. 2002) (Rosen, J.) (Title VII discrimination plaintiff was not entitled to bring claims in federal court where he had filed a charge of discrimination against employer on February 28, 2000 but voluntarily withdrew the charge on July 25, 2000; "Not having given the Commission the opportunity to attempt conciliation or voluntary settlement, Jenkins also has failed to exhaust his administrative remedies.")).  *Accord Bowers v. Nicholson*, 271 F. App'x 446, 447 (5th Cir. 2008) (p.c.) (Higginbotham, Stewart, Owen) ("The Equal Employment Opportunity (EEO) counselor . . . indicat[ed] that he should only sign the withdrawal forms if he did not want to follow through with his complaints.  * * *  Bowers signed the withdrawal forms and sent them back to the EEO counselor . . . .  * * *  Because Bowers withdrew his claims, he failed to exhaust his administrative remedies; the district court did not err in dismissing his claims on that basis.").[13]

_____

[13]

*Accord Pearsall v. Holder*, 610 F. Supp.2d 87 (D.D.C. 2009) (by filing and then withdrawing EEO complaint alleging that transfer constituted a "functional demotion", employee failed to exhaust administrative remedies and could not bring that claim to court under Title VII and the ADEA);

*Mahomes v. Potter*, 590 F. Supp.2d 775, 786-87 (D.S.C. 2008);

*Sharon v. Yellow Freight Sys.*, 872 F. Supp. 839, 846 (D. Kan. 1994) ("[a] claimant who abandons or withdraws his or her claim before the agency has reached a determination cannot be deemed to have exhausted administrative remedies");

**DISCUSSION:  State-Law Claims**

That leaves only White's state-law claims.  The court has supplemental jurisdiction[14] over the MELCRA claims, but our Circuit emphasizes that "'[s]upplemental jurisdiction is a doctrine of discretion . . . not of right.'"  *Hendrixson v. BASF Const. Chems. LLC*, – F. Supp.2d –, 2008 WL 3915156, *20 (W.D. Mich. 2008) (Maloney, C.J.) and *Lake v. Granholm*, 2008 WL 724162, *14 (W.D. Mich. Mar. 17, 2008) (Jonker, J.) (quoting *Habich v. City of Dearborn*, 331 F.3d 524, 535 (6th Cir. 2003)); *see also Baer v. R&F Coal Co.*, 782 F.2d 600, 602 (6th Cir. 1986) (p.c.) (citing *UMWA v. Gibbs*, 383 U.S. 715, 726 (1966)).

Having disposed of White's lone federal claim, the court exercises its discretion under 28 U.S.C. § 1367(c)(3) and declines supplemental jurisdiction over claims which arise under state law. *See Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claim should not ordinarily reach the plaintiff's state-law claims.") (citing 28 U.S.C. § 1367(c)(3) and *UMWA*, 383 U.S. at 726 ("Certainly if the federal claims are dismissed before trial . . . the state claims should be dismissed as well.")), *cert. denied*, 549 U.S. 1279 (2007)); *see also Musson Theatrical, Inc. v. Fed Ex Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims . . . .").

_____

*Brown v. NYC*, 869 F. Supp. 158, 170 (S.D.N.Y. 1994) (holding that by withdrawing his EEOC claims, plaintiff "effectively failed to exhaust his remedies").

[14]

"The single term 'supplemental jurisdiction' now encompasses the two judicially created doctrines formerly referred to as 'pendent' and 'ancillary' jurisdiction.  28 U.S.C. § 1367, enacted [in] 1990 . . . was intended to codify these case law doctrines."  *Salei v. Boardwalk Regency Corp.*, 913 F. Supp. 993, 997 n.1 (E.D. Mich. 1996).

"There does not appear to be any extraordinary circumstances to justify departing from th[e] general rule" disfavoring supplemental jurisdiction. *Pickelhaupt v. Jackson*, 2008 WL 4457823, *13 (E.D. Mich. July 22, 2008), *R&R adopted in part & rejected in part o.g.*, 2008 WL 4457807 (E.D. Mich. Sept. 30, 2008). The interests of justice and comity are served by deferring to Michigan's courts, which are best equipped to interpret and apply their own State's law governing sex discrimination and retaliation in the first instance. *See Allen v. City of Sturgis*, 559 F. Supp.2d 837, 852 (W.D. Mich. 2008) (Paul L. Maloney, J.) (citing, *inter alia*, *Widgren v. Maple Grove Twp.*, 429 F.3d 575, 585 (6ᵗʰ Cir. 2005) ("[T]he district court did not abuse its discretion in declining to exercise supplemental jurisdiction over the state law issues based on its consideration of *the interests of justice and comity best served by a state court's resolution of the remaining state law claims*.") (emphasis added)); *State Farm Auto. Ins. Co. v. Carter*, – F. Supp.2d –, 2008 WL 5740100, *18 (W.D. Mich. 2008) ("When reasonably possible, it is far preferable for Michigan courts to interpret Michigan law . . . . This is even more true [given that Michigan] judges . . . are elected by, and thus directly accountable to, the citizens[15] . . . ."). *Accord Trustees of Marion Kingdom Hall of Jehovah's Witnesses v. City of Marion*, – F. Supp.2d –, –, 2007 WL 4569718, *11 (S.D. Ill. Dec. 26, 2007) (Murphy, J.) (once federal claims have been dismissed, "'respect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, become paramount concerns'") (quoting *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 727-28 (7ᵗʰ Cir.

---

[15] *See Christmas v. Macomb Cty. Cir. Ct.*, 2008 WL 251995, *3 (E.D. Mich. Jan. 30, 2008) (referring to a Michigan "Circuit Court Judge, having been elected to a six-year term in November of 2004"), *recon. denied*, 2008 WL 360998 (E.D. Mich. Feb. 11, 2008); *Surman v. Baragar*, 2006 WL 2162177, *1 n.1 (W.D. Mich. July 31, 2006) (Enslen, J.) ("Judge Dimkoff's elected position is as Newaygo County Probate Court Judge . . . .").

1998)).[16]

# ORDER

The defendant's motion for summary judgment[17] [document #29] is **GRANTED in part and DENIED without prejudice in part.**

The Title VII pregnancy discrimination claim is **DISMISSED without prejudice** for failure to exhaust administrative remedies.

Pursuant to 28 U.S.C. § 1367(c), the court declines supplemental jurisdiction over the state-law claims, which are **DISMISSED without prejudice**. *Cf. Mayberry v. Endocrinology-Diabetes Assocs.*, 926 F. Supp.2d 1315, 1327 (M.D. Tenn. 1996) (after granting motion for SJ on pregnancy-

---

[16]

*See, e.g.,* exercising § 1376(c)(3) discretion to dismiss state-law claims without prejudice:

*Thornton v. Fed Ex Corp.*, 530 F.3d 451, 454 n.1 (6th Cir. 2008) (noting, "[t]he district court awarded summary judgment to Fed Ex on plaintiff's claims under federal law and then, declining to exercise continuing supplemental jurisdiction, dismissed the state law claims without prejudice.");
*Slusher v. Delhi Twp., Ohio*, 2009 WL 2145608 (S.D. Ohio July 14, 2009) (Beckwith, J.);
*Wideman v. Montano*, 2009 WL 1949082 (W.D. Ky. July 7, 2009) (McKinley, J.);
*MEE Pension Fund v. EE&D*, 556 F. Supp.2d 746, 782 (W.D. Mich. 2008) (Maloney, J.);
*Poindexter v. McKee*, 444 F. Supp.2d 783 (W.D. Mich. 2006) (Miles, J.);
*Reinhardt v. Dennis*, 399 F. Supp.2d 803, 811 (W.D. Mich. 2005) (McKeague, J.);
*Glover v. Elliott*, 2007 WL 4557853, *5 (W.D. Mich. Dec. 21, 2007) (Bell, C.J.);
*Forner v. Robinson Twp. Bd.*, 2007 WL 2284251, *8 (W.D. Mich. Aug. 7, 2007) (Quist, J.);
*Henderson v. Caruso*, 2007 WL 1876471 (W.D. Mich. June 28, 2007) (Greeley, M.J.);
*Herron v. Caruso*, 2005 WL 1862036, *6 (W.D. Mich. Aug. 2, 2005) (Edgar, J.);
*Faller v. Children's Hosp.*, 2009 WL 29878, *2 (S.D. Ohio Jan. 5, 2009) (Susan Dlott, C.J.).

[17]

*Cf. Edelman v. Lynchburg College*, 300 F.3d 400, 403, 404 (4th Cir. 2002) (Wilkins, J.) ("The College moved to dismiss, asserting *inter alia* that the district court lacked subject matter jurisdiction over the Title VII claims because Edelman had not timely filed a charge with the EEOC. * * * [B]ecause the district court considered materials outside of the pleadings, we treat the College's motion as a motion for summary judgment.") (citations omitted).

discrimination claim, court declined supplemental jurisdiction over remaining claims).[18]

A separate judgment will issue as required by FED. R. CIV. P. 58.

This is a final and appealable order.[19]

Dated: September 11, 2009               /s/ Paul L. Maloney
                                     Honorable Paul L. Maloney
                                     Chief United States District Judge

---

[18]

When a federal district court declines supplemental jurisdiction over state-law claims,

the claims will be dismissed and must be refiled in state court. To prevent the limitations period on those claims from expiring while they are pending in federal court, [28 U.S.C.] § 1367(d) requires state courts to toll the period while a supplemental claim is pending in federal court and for 30 days after its dismissal unless state law provides for a longer tolling period.

*Jinks v. Richland Cty., S.C.*, 538 U.S. 456, 456 (2003) (Scalia, J.) (syllabus).

[19]

The refusal to exercise supplemental jurisdiction is appealable, but it is reviewed only for clear error. *Bell-Coker v. City of Lansing*, 2009 WL 166556, *8 (W.D. Mich. Jan. 21, 2009) (Maloney, C.J.) (citing *Reynosa v. Schultz*, 282 F. App'x 386, 390-91 (6th Cir. 2008) (citations omitted)).